You may begin. Good morning. Morning. May it please the court. My name is Alan Schroeder. I represent the ranchers and the appellants in this matter before the court this morning. We get to talk about wild horses, the American icon of the West. But sadly, we are dealing with an issue where the federal government is not taking care of them as well as the underlying public land upon which they depend. The federal government issued decision records that were seemingly going to provide a plan to fix that problem. But a closer examination of that plan revealed something that did not reverse the harm, did not restore the natural thriving ecological balance, all without any legal substance. The district court agreed and gave the government a pass. We're now before the court today for this court to provide the needed substance. So how do we get there? It's apparent we need to get there because however odd it is that the Wild Horse and Burrow Act was passed in 1971 and then amended in 1978, there hasn't been a court, particularly within the Ninth Circuit, that has made a decision or decided on the meaning of immediately as it's used in Section 133 or 1333 in the Wild Horse and Burrow Act. One can get some context for that by looking at the Act. The Act, when it was enacted in 1971, was remarkably unanimously passed by Congress. It was unanimously passed because there was a problem with the killing and harassment of the wild horses, even sometime for sport. And so the Act was overwhelmingly passed by Congress and yet it was overwhelmingly successful in curing the  Just a short seven years later, Congress had to take another look and they took another look in enacting the multiple use Sustained Yield Act and other and additionally with that these amendments to the Wild Horse and Burrow Act that brought before you today the main portion of the Wild Horse and Burrow Act as amended in 1978. That's Section 1333 B2. That is really the focus here today. What's important about what happened in 1978 is Do you mind if I interrupt?  So that if we're looking to the text of the statute for immediately, would you agree that it can't happen overnight? So there are certain definitions of immediate that would suggest something overnight or right away and there are practical realities behind you know, what the agency proposes to do and how to do it over a 10-year span. So give me your sense of what immediate should mean in the context of these practical realities. Well, certainly it means as what the Colvard decision said in the DC Circuit in 2022 that it should mean that after they have made the requisite determination under the Act, that's the focus that if there's a determination of excess, if there's a determination that there should be an action to  then at that point in time, it must be done expeditiously as possible. But I mean when we look at the statute, it certainly does use the word immediate. There's no question about that. But then the statute follows up the use of that word with a series of required actions, which by definition can't be done immediately. The secretary has to order old sick and lame animals to be destroyed. The secretary has to set up a plan where people can adopt them. The secretary then has to take the potentially adoptable animals that can't be adopted, has to have them destroyed humanely. I mean these things can't all be done like yesterday. I would agree with that. And it's important to know that even Judge Ginsburg, when she was on the DC Circuit and issued the 1982 opinion in the American Horse Protection, she grappled with this issue. And what she said is important of what I wanted to get to in terms of your question too, Judge Sanchez, is there was a shift in focus in 1978. The shift in focus was from the protection of the horse to the protection of the underlying public lands. And so with that, it's important to note that when reading the answering brief of the federal government in this case, the entire focus is just on the horses and to your question, Judge Bennett, as dealing with the element of these practical realities that you have. And so really when you get into that, Aren't those two things related? I mean part of the statutory language is to restore a thriving natural ecological balance to the range. So one component of it is removing excess wild horses. But another part is making sure that the population stabilizes so that you don't have to go back and do it again. And so I think when you talk about it, even if there was a shift in focus to the public lands, it's still tied to the humane dealing treatment of the horses themselves. And so I get back to my original question. What is that you are proposing? That is that the agency ran afoul of when it used the word prompt or other things to move quickly, but not in an overnight fashion, which it couldn't do. Three things. One is that certainly elevating the standard as we've argued in the brief that it should be done expeditiously as possible. Second, in terms of the three components that these plans themselves did, one dealing with initial gathers, second dealing with fertility control, third dealing with subsequent gathers, there is a lack of any sideboards within these plans, within these decision records, and that goes to the heart of your question, and that goes to the heart of of why the ranchers are here today. When you say sideboards, do you mean timeframes? If they have to specify timeframes? Certainly, as to the initial gathers, yes, there isn't any temporal temporal sideboards at all on that in terms of the fertility control. Do any of these district court cases indicate that the word immediately means the agency must provide a timeframe in their plan? There isn't anything in the what? No, there isn't. Is there anything in the statutory? So are you rooting that reading in the word immediately that there has to be a timeframe in an agency's plan? I would submit to you at least the parameters for one, and that's the fault, and that's the fatal flaw in these decision records in that in the briefing that the government has done, they talk about weather issues. They talk about the foaling of when the mayors are foaling and giving birth to their animals. They talk about contractor. The statute could have required that, a number, right? They could have, yes. But it doesn't, right? That's correct. So I am struck by language I know you're familiar with from Loper Bright. To stay out of the discretionary policymaking left to the political branches. Judges need only fulfill their obligations under the APA to independently identify and respect delegations of authority, police the outer statutory boundaries of those delegations, and ensure the agencies exercise their discretion consistent with the APA. And you're saying, as I understand you, that we should tell the agency you need to set a number. I don't see how that's consistent with the direction that the Supreme Court has given us to leave those kinds of decisions to the political branches. Well, in the context of, at least in the Culver decision, the District Court of the District of Columbia, in that particular case, said what the government did there, all they did is they issued a plan and said, we will do all these actions to meet a thriving natural ecological balance, to deal with the excess, and to say you're going to do that sometimes within 10 years is not lawful. That's why this is such a unique situation and an uncharted territory for this court as to, okay, there must be some sideboards. I don't want to sit here, Judge Bennett, and say, by God, you issue a decision record and then it says in two weeks it is. There has to be some standards that must be within the decision record. For example, you just can't build a nice car and it does everything, but you don't give the gas and you don't give the oil so it can run and do the work. Much like that's what happened here. They put together a... But the Little Fish and the Stone Cabin management plans both indicate that the initial step is to remove the excess wild horses promptly or, you know, it uses language of some type of urgency. And then it has this follow-up. So the 10-year plan contemplates here, moving, you know, quickly enough, expeditiously to deal with the excess horses, and then, you know, roll out the rest of the 10-year plan. Why is that not sufficient for the immediacy standard? Simply because if you look at the decision record, if you look at the final EA, they talk about all of these conditions to maximize the discretion to let the government do whatever they want, but they don't put any sideboards around what they do. For example, weather. In an environmental assessment document, it would be very appropriate for the government, the sideboard is, is that the weather is, within this time period, gives the opportunity for gather. The foaling period, it typically occurs within this period. And what about funding? Well, I would submit to you, and that goes to our issue number three, Judge Bennett, that any, what we have said in the briefing, is out, off-site things, such as funding. Talk about things that are not even in the Act. That clearly is not even in the Act. So, so it, the agency's job is to comply with the mandate, even if Congress hasn't given them the funds to do it? Well, I guess then we get, I would submit to you, yes, it's not like they are unfunded. And so who do we issue the order to? Pardon? Do we issue the order to the Congress to appropriate more? Well, certainly, at least in this fiscal year, they have appropriated $144 million. So it's not like they haven't appropriated money, year after year, to achieve the objectives and issue the decisions that they have. But when I look, for example, at what Judge Sanchez was referring to for Little Fish, I see, for example, at ER 129, and this is just one of many statements. While the agency's plan is to promptly remove all excess animals above low AML, it is unlikely that a single gather can achieve this. I mean, you don't quarrel with that statement per se, right? No. But when you have that kind of an overview, which is, we have to get down to a particular number, but we don't know exactly how many gathers it's going to take, I mean, doesn't that mean that the agency has to have discretion to be able to do it in a way they think is going to work, but consistent with the requirement that they use humane means? Well, within the slight discretion that they have, remember, once the determination is made, which it was made in this case, that triggers, you know, a mandate at that point in time in the Act to Act. And so I appreciate the struggling that exists in, okay, well, how do you balance that human, humanitarian treatment of animals? But there's got to be a limit, and that limit can be in creating a standard, an expeditious standard instead of a prompt standard that they're required to act. It can be done by putting sideboards on what initial gather means. I mean, certainly Culver said initial gather doesn't mean sometime in 10 years. Are we arguing about the difference between prompt and expeditious? Well, certainly. What's the difference? Well, certainly under the definition in the brief, there's an indication that it's a higher level standard upon scrutiny upon which they can act. I mean, in the Western Conservation Protection case, they talked about that, you know, there is a trigger associated with this, and that they're required to act over all other resources associated with that. And you just can't lay back and just say, oh, but we're just going to wait. There needs to be some kind of... But isn't there a separate remedy if the agency falls back and says, let's just wait? I mean, this is an action challenging the plan itself. You could file a different action if the agency isn't moving on the plan, but you haven't done so, under a different provision of the APA. Correct. So isn't that, maybe the resort should be to press the agency to actually fulfill the plan rather than to challenge the plan details itself. I hear what you're saying, and there's perhaps, I would say, a remedy under 7061, but in that context, you have to deal with all the different track standards. In this, we're looking at the 7061 claim, or excuse me, a 7062 claim on the unlawfulness of the application of the Wild Horse and Burrow Act itself. And certainly, it's the position of the appellants in this case that there needs to be initial focus there to create a standard, because without any of these standards that we're talking about in issues one, two, and three, moving then to a 7062, you're going to grapple with the same thing, just like in the Western Conservation Protection case. It appropriately went through all of everything we're speaking about here under 7062, but then defaulted and then applied the 706, it was a 7061 case, and then said it didn't need to do anything, but it didn't reach the core issues of what we're talking about here. What is the standard? Counselor, you've exhausted your time. Yes, I have. My colleagues have any more questions, but we've taken up a lot of your time with questions, and we'll give you three minutes for rebuttal. Thank you. Thank you. Good morning, Your Honors. May it please the Court. Tamara Rountree for the United States. I'd like to begin with the specificity that plaintiffs contend is required here. It's their position that under the Wild Horses Act, the gather plans are required to identify and put in place a specific temporal limitation on when the initial gathers would occur. Now, plaintiffs don't identify, as the Court has recognized, plaintiffs don't identify any provision in the Act which imposes that kind of specificity on the plans. In fact, the Act doesn't address plans, gather plans at all, let alone specify what BLM is required to include in them. And there can be no dispute that the Act does not require that the plans specify a specific amount of time, in essence, a deadline, by which the gather and removal actions will occur. Ms. Rountree, could the, I'm not saying that the agency is required to, but could the agency identify a timeframe in which an initial gather might take place, given weather patterns and other circumstances? Is that something the agency could do? Well, Your Honor, I appreciate the question. And I think the Court, though, appreciates the difficulty in doing that. And in doing that in a way that's not arbitrating, completely capricious. Because not only does BLM have to account for the undisputed practical realities, on-the-ground realities of gathering and removing wild animals off an open range, but it's also what's required in the statute. So, as Judge Bennett pointed out, in Sections 1333b to a through c, there's quite a list of what BLM has to do. So there certainly is counsel, but I think what gives me pause in the case is that although Congress certainly did put in these other things that the agency had to do, they used the phrase immediately remove excess animals from the range. And the Supreme Court has recently said something like we're all textualists now and we go to dictionary definitions or contemporary sources for immediately. And it's hard to reconcile what the agency is doing, maybe because it's the only way they actually can achieve it, with the words in the statute immediately remove excess animals from the range. Because in the way the word immediately is used, normally by the Congress, what the agency is doing is not immediately removing excess animals from the range. So how do we square the United States and the agency's position with the actual phrase used by the Congress? Well, I first would like to begin with, we have to be careful when we discuss what BLM does immediately. We're slipping into implementation execution language, which is, it's a 7061 claim. The question here is what do the plans say? It's not what has BLM done or whether it will do it or when will it do it. It's what did it say in the plans that it will do. And so the question here is the court has to look at the plans themselves to determine whether BLM reasonably provided that the statute's requirements for immediacy and their instructions for the actual gather and removal would be carried out. We can't talk about when BLM actually hit the ground. But to your point about the definition of immediacy, to be honest with you, the court doesn't even have to define it because we're talking about gather plans, not when did the agency get out on the ground. Immediacy, initially, I thought immediacy, immediate, meant immediate. And then I spent time with this case and realized immediacy or immediately remove gathers its meaning from the context in which the words reside. Here we look at the statute. And as I said, the statute clearly indicates that immediately doesn't mean tomorrow, even next week, given all that BLM is required to do by Congress. But I'll offer the court two examples of the use of immediate to show you how different the meaning could be. One of which is we're here in the courtroom. Someone walks in and says there's a fire. There are flames down the hallway. Everyone has to move, leave the courtroom immediately. The person who yells at looks at me and says they can see in my face, but I want to stay here and finish my argument. And they say, no, no, you leave immediately. Our interpretation is I need to get out of there right away. No delay at all. Second scenario, the court gets miffed with me and says, Miss Rountree, you need to leave immediately. But the context is the rules of occupancy of this building or that anyone who enters the building must take all of their possessions before they leave. I understand that and I believe reasonably that the court means I need to leave, but I need to remove my possessions from the lectern, my possessions from counsel table, wherever my coat is, remove it, and maybe slip into the restroom and then leave. And I think that is still in keeping with what the court meant by leave immediately. So as we can see, immediately, oddly enough, escapes specificity, the exact kind of specificity that plaintiff's claim is required here by the statute. When I look at this case, I ponder what am I trying to decide because even if we're having difficulty understanding Congress's intent behind immediately, I'm having a difficult time discerning a difference between promptly and expeditiously. Do you see a difference between those two words? Because again, as you said, we are looking at the plan itself. And so if it has a defect, is it because the word prompt was being used instead of expeditious? What do you see as a difference between those two words and whether one imposes an additional requirement? I think not, Your Honor, and I believe Your Honor actually spoke to this a little bit. And I'll offer this to the court. I didn't even want to offer a definition of immediate because I don't think the court needs to define it here. It just needs to look at the plans and say, did BLM say it was going to do what Congress said it needed to do? And plaintiffs here, for example, don't dispute that the plans set out that they'll provide for the statutes and requirements for the way in which the gatherer will be done. All of the A through C, the subparagraphs A through C, all of that will be done. So the question is, did it provide for, in a reasonable way, providing for the immediacy that Congress required in the plans? Again, do the plans say, we will do it immediately? So I think a possible definition or explanation could be is that removal could be immediate or promptly or expeditiously, choose your word, as possible, taking into account all that is required for gather and removal under the statute. So I don't think, long way of saying, I don't think the words, as long as they convey urgency, it doesn't matter if you pick prompt, immediate, or expeditious, for example. And really the second half of that sentence would almost be surplus because you have to take into account those other requirements of the statute anyway.  You'd probably infer it within the language of the word anyway.  And that's required under principles of statutory interpretation or it's required by this statute that we look beyond the words. Sorry. You said convey urgency. You think if the plan conveys urgency, then it satisfies the immediacy requirement of the statute? I believe if it recognizes that Congress says we are to immediately remove and that is what this plan is intended to do, then it has satisfied the requirement. Because ultimately a plan is stuck with words. Again, we're not talking about implementation. We're not talking about boots, hooves on the ground, feet. We're talking about what the plan says. So yes, that's correct, Your Honor. It's whether the plans actually speak to the immediacy. And I'll offer the court Western Rangeland and Culver, I believe, in which BLM actually said honestly admitted to the public we are going to need six to ten. I think it was six to ten years in Western Rangeland and it was ten years in Culver that BLM said we need the full ten years to do the initial gather. That's not what's said here. And I think, Judge Santos, you're quite on the money. There's a specific breakdown in the timing. The ten years is for the latter, the population control and possible maintenance gathers after the initial gathers occur. But the initial gather is what's to occur immediately and both of the plans speak to that. What is the time frame for an initial gather just, you know, in a ballpark? I talked to the agency about that and it's just too much to, there are too many variables to say. But doesn't that kind of lend credence to what the rangers are saying is if you can't tell me what an initial gather time frame might be, how do I know that this case is very different than Western Rangeland which was candid in saying it takes ten years to even do an initial gather and that's too long? I thought you were speaking in general. So I think BLM if they heard zero went on a specific case I thought you meant No, for this case. Right. And I most certainly can't speak to that but I will offer for example one of the things that if the agency people perhaps were hearing could, were forced to give you some kind of specificity which again is not required in the statute. One of the things we have to account for is for example the statute requires that BLM find an old, lame and sick horses. I offer the court one of the first steps BLM has to do before it can remove any horse is get personnel out there and for the stone cabin gather plan for example there are over 1,000 horses currently in that herd. That means go through over 1,000 horses just to identify those that are lame or sick or old. And so there could be a time frame and BLM probably could come up with numbers. The degree to which those numbers are hard and fast again not required perhaps would vary but I'm certain they could come up with numbers but the point is BLM then could get hit with a lawsuit which says that number was pretty arbitrary but in any instance numbers are needed. What I take the ranger's point is look we want to see what the ballpark numbers might be. Would it be through this action where you challenge the plan and the agency's response is no we don't have to give you specificity and if you do an enforcement plan would the agency then have to give numbers or would you say well we're doing the best we can. At what point does the agency if ever have to give numbers in order to try to fulfill its obligations? Well to be honest with you and please don't be angry with me if sounding like a broken record. It's just not required by the statute. It would be a different thing if Congress decides you know what we played with language about immediate removal we're going to give you numbers now or we're going to give you specific time frames. So in your view and I think going to what the ranchers say and to one of Judge Sanchez's questions. I'm looking for example at ER 130 for the Little Fish plan. The management objective for the Little Fish Lake JMA is to achieve low AML as immediately as possible. Indeed. So it's like we're going to try to do it immediately but we don't know how long it's going to take and so immediately as possible could like mean almost anything. Well I wouldn't want to offer that extreme and there may be it may be the circumstance that when the plan was written and that's the time frame we're looking at when it was written and approved. Timing could have been different. Weather conditions, helicopter pilots availability all sorts of circumstances could have been different and it could have happened under a quicker time frame. We can't speak to that now but the question was did BLM abide by what Congress required? Not and it's not much in terms of what a gather plan and again I go back to the fact that the Act doesn't speak to plans at all so we're kind of swimming in uncharted waters of trying to define what BLM was required to say about gather plans and specificity of timing when Congress doesn't address any of that. I think we've touched upon most of the major points and Judge Sanchez initially you said something about the 10 years and I thought perhaps you thought BLM contemplated that the initial gathers would take 10 years and I spoke to that and I think you understood that the record is clear. The 10 years is part of an overall I'll call them future oriented which is population control and the maintenance gathers that would occur after the initial gathers took place and AML was achieved. Unless your honors have any additional questions I will just end by saying those components those elements of the gather plan that were written and approved by BLM are they don't adopt and identify any latency periods. They specifically require what it is that  sought and should be upheld and the district court's judgment should be affirmed. Thank you counsel. Thank you Judge Bennett for giving me three. Okay. Thank you for giving me a couple more minutes but I will be very brief. As you just heard and as the briefing of the government demonstrates there is nothing. So I have two things to say to you. In my left hand I'm making it hard on you and the ranchers don't intend to do that but these are very important uncharted waters that we ask this court to provide some parameters on. In my right hand you can do this very easy. The Culver case, everything that you just heard from counsel, the Culver case is flat on in saying that simply saying you're going to do something in 10 years does not conform to the wild horse and burrow act. So if you go the Culver route that is the way to go. Then it would get sent back to the agency to deal with the parameters in the left hand. I submit to you that you can decide this favorably in providing certainty for the public land as well as the horses by reversing this and remanding this down to the district court for a remedy phase. Thank you. All right. We thank counsel for their arguments and the case just argued is submitted.
judges: BENNETT, SANCHEZ, Holcomb